DOW CHEMICAL CO. *v.* AMERICAN BROMINE CO.

1. TRADE SECRETS—INJUNCTION—MASTER AND SERVANT—PATENTS —DISCLOSURE OF TRADE SECRETS BY EMPLOYEE.

In a suit by a corporation engaged in the manufacture of bromine and bromine compounds to enjoin defendant corporation and a former employee from using the electrolytic and blow-out process in the manufacture of like

On injunction to protect trade secrets, see notes in 13 L. R. A. 652, 12 L. R. A. (N. S.) 102, 20 L. R. A. (N. S.) 933, 44 L. R. A. (N. S.) 1160.

On secrets of trades, compounds and medicine, see note in 22 L. R. A. 674.

products, claiming that defendants were using plaintiff's patents and also using trade secrets obtained by said employee while in plaintiff's employ, the defense being that such patents as were being used had expired, and the same were free and open to the public, evidence examined and *held*, insufficient to establish plaintiff's claims.

2. SAME—EVIDENCE—SUFFICIENCY.

Undisputed evidence *held*, to establish the fact that no "trade secrets," in a legal sense, ever existed in plaintiff's plant.

3. SAME—PATENTED PROCESS NOT A TRADE SECRET.

The action of plaintiff's president and inventor of its process and apparatus in patenting same, by reason of which he was under obligation to disclose the best mode of applying it, in return for which he received an absolute monopoly, for a limited time, negatives plaintiff's claim that in manufacturing its products by the use of said patents it was relying on keeping the process a secret

4. PATENTS—FULL DISCLOSURE TO BE MADE BY PATENTEE.

Under the patent law (U. S. Rev. Stat. § 4888) an inventor is required to set forth "the manner and process of making, constructing, * * * and using it in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct * * * and use the same, and in the case of a machine, he shall explain the principle thereof and the best mode in which he has contemplated applying that principle."

5. SAME—REMEDY FOR INFRINGEMENT IN FEDERAL COURTS.

Plaintiff's remedy for infringement of patent is in the Federal courts:

6. TRADE SECRETS—PATENTS—FAILURE TO DISCLOSE BY PATENTEE BAR TO EQUITABLE RELIEF.

Plaintiff's claim, supported by testimony, that in securing its patents it purposely refrained from disclosing the best mode in which it contemplated applying the principle of its patents, and that the same was a trade secret, *held*, to bar equitable relief.

7. PATENTS—CONTRACTS.

A patent used by defendant corporation and secured by the individual defendant over a year ·after he left plaintiff's

employ, *held*, not to be within the terms of his contract with plaintiff whereby all inventions and discoveries made by him while in its employ became its property.

8. TRADE SECRETS—INFRINGEMENT OF PATENT—ESTOPPEL.

Where, during the building of defendants' plant, and in numerous interviews with defendants, plaintiff's only claim was that defendants' patent and process were infringements of plaintiff's patents, its claim in this suit that defendants were using its trade secrets, unlawfully obtained, *held*, to be an afterthought.

9. MONOPOLIES—RESTRAINT OF TRADE—CONTRACTS—ENFORCIBILITY —STATUTES.

Under Act No. 329, Pub. Acts 1905 (3 Comp. Laws 1915, § 15033), relative to contracts in restraint of trade, an employee could not, by contract or understanding, lawfully bind himself to forever refrain from engaging in the manufacture of products by the process used by his employer, either by himself or in conjunction with others.

10. SAME—TRADE SECRETS—INJUNCTION—PUBLIC POLICY—EQUITABLE RELIEF.

Upon broad equitable principles and in consideration of public policy, plaintiff should be denied relief, enabling it to continue a practical monopoly, unless its claim thereto is clearly established.

Appeal from Wayne; Searl (Kelly S.), J., presiding. Submitted January 9, 1919. (Docket No. 14.) Decided June 7, 1920.

Bill by the Dow Chemical Company against the American Bromine Company and another to enjoin the manufacture of certain chemicals. From a decree for plaintiff, defendants appeal. Reversed, and bill dismissed.

*Beaumont, Smith & Harris, Fay, Oberlin & Fay,* and *Gilbert A. Currie,* for plaintiff.

*Humphrey, Grant & Humphrey* (*William L. Carpenter, John C. Pennie, Arba B. Marvin, Thomas G. Long* and *George J. Hesselman,* of counsel), for defendants.

The plaintiff is engaged at Midland and Mt. Pleasant, in this State, in the manufacture of bromine and bromine compounds. It manufactures a variety of other chemicals and chemical products. The enterprise was founded about 1890 by Herbert H. Dow, a chemist by profession, who has always been the principal owner and in control of the business. There have, at different times, been different forms of business organization and different corporations have succeeded one to another, to all of which plaintiff is the successor. Bromine is manufactured from brine of the same character as that from which salt is commonly made and the brine is pumped from wells and piped in the same way. Not all salt brines are of sufficiently high bromine content to be commercially workable. The brine in the vicinity of Midland is known in the chemical industry, through government and trade publications, to be one of high bromine content. The plaintiff's method of manufacture has for years been an electrolytic blow-out absorbing process.

The corporation defendant engaged in 1916—shortly before the bringing of this suit—in the manufacture of bromine at Midland. It also has installed in its plant an electrolytic blow-out absorption process. The individual defendant is the consulting chemist of the corporation defendant, he having other business as well. He assisted in designing the plant as it was constructed. He holds United States Patent No. 1,-085,944, issued to him as inventor, covering the absorption step in the process of manufacturing bromine. This patent was applied for December 14, 1911, and issued February 3, 1914. The corporation defendant's plant is equipped for operation under the patent, having obtained a license from the individual defendant. Mr. Schaefer was formerly in the employ of the plaintiff, going there in 1904 direct from college, on advice of his professor (who was also a stock-

holder and director of plaintiff) that "it was an excellent opportunity to get experience in the chemical manufacturing business." In 1905, he was in charge of the bromide plant and, after being away for some time, in 1908 he became superintendent of the bromide plant. He left plaintiff's employ in July, 1910. Another chemist, who had been "assistant to the superintendent" of plaintiff's plant but had left plaintiff's employ in July or August, 1913, had also assisted the corporation defendant in designing its plant in the early stages. This was before the license to use Mr. Schaefer's patent had been obtained. Soon after the license to use the patent had been obtained and Mr. Schaefer had been employed, the other chemist was let go. A large part of his ideas and work was then discarded.

While Mr. Schaefer was in the employ of the plaintiff he was required to sign a contract in writing—

"that all inventions and discoveries, pertaining to the manufacture of bromides, bleaching powder, or benzoates which may be made by him while in its employ shall become the property of said company, and that he will assign to said company all applications made by him for letters patent of the United States and elsewhere; and all letters patent that may be granted to him covering such inventions and discoveries, without further compensation. That he will promptly on conception of any patentable idea or invention pertaining to such bromides, bleaching powder or benzoate business of the company disclose the same to said company, and on its request so to do, make application for letters patent covering such discoveries; and that he will execute all other papers whatsoever that may be necessary to transfer to and vest in said company all the right, title and interest in and to such inventions and discoveries."

All other technical employees were required to do the same.

This controversy relates:

(1) To the method of construction, installation or equipment of the plant of the defendant corporation; (*a*) whether certain methods of construction there used constitute an appropriation of methods used in the plant of the plaintiff which are entitled to recognition and protection as trade secrets, and (*b*) whether the complete process for the production of bromine, involving the four steps hereinafter stated, is a trade secret of the plaintiff.

(2) To the patent taken out by defendant Schaefer —whether it belongs to plaintiff under the contract from which a quotation is above given.

The plant of the plaintiff has been the only bromine producing plant in the United States operated on the electrolytic blow-out absorption process. It likewise has been the only such plant operating on raw brine. All other producers in the United States operate on a distillation process, using not raw brine but bitter or bittern waters, usually being residual waters from the manufacture of salt or some other product. Bromine is produced in Germany by the electrolytic blow-out process, there known as the Kossuth process or cell. It has been so produced for years. The Kossuth process has been described in the literature of the industry and is quite generally known to those interested in the industry. Mr. Schaefer had studied the subject in the original German publications before undertaking the equipment of the plant of the corporation defendant. The Kossuth process is not operated in Germany on natural brine. Bromine is not there found in brine, but in salt deposits, which are first dissolved in water, making a brine from which the bromine is extracted.

The production of bromine from brine involves four steps or operations:

*First.* The freeing of the bromine from its chemical bond in the brine. This is done by causing the brine to flow through an electrolytic cell or tank hereinafter described.

*Second.* The removing of the bromine thus set free in the brine from the brine. This is done by blowing through the brine a current of air into which the bromine passes. This takes place in a tower from the top of which the brine is dripping down and from the base of which the air is blown upward.

*Third.* The removing from the bromine-laden air of the chlorine which is inevitably present, being freed from the brine at the same time the bromine is freed and passing into the air at the same time as the bromine. This is done by bringing the air in contact with, in the Dow plant, iron or bromide of iron, in the American Bromine plant, bromide of sodium, which, having a greater affinity for chlorine than for bromine, absorbs the chlorine, thus leaving bromine only in the air.

*Fourth.* The absorbing of the bromine from the pure bromine-laden air. This is done, in the Dow plant, by bringing the bromine-laden air in contact with either sodium or potassium carbonate, which absorbs bromine from the air, forming bromide and a smaller proportion (about 25%) of bromate, the latter being an impurity. It is done in the American Bromine plant by bringing the bromine-laden air in contact with ferrous bromide, which absorbs the bromine from the air and becomes ferric bromide. This ferric bromide, being pure iron bromide, is directly convertible into any of the bromides of commerce.

At or about the time of the origination of the enterprise at Midland, Mr. Dow took out United States patent No. 460,370, issued September 29, 1891, and reissued as No. 11,232, April 12, 1892. This covered a "process of extracting bromine." The specifications in that patent, both original and reissue, set forth (1) a tank in which the brine is treated electrolytically or by other means; (2) a room in which bromine is by air blown out of the brine; and (3) a container in which the bromine is absorbed from the air. This omits the third step in the process. Other patents have been taken out by Mr. Dow from time to time — approximately 17 in all — covering directly some

step or incident of the process or some appliance usable therein. Several of these patents, the earliest being issued November 25, 1902, disclose in their specifications the purifying or third step before stated. The matters disclosed in the specification of the patent are not within the monopoly of the patent, but are free and open to use by the world at large. Walker on Patents (5th Ed.), § 176, and cases cited. The monopoly term of the first patent above mentioned expired in 1909 and the patent then became free and open to use by the world at large. Copies of all of plaintiff's patents and of all other United States patents relating to the manufacture of bromine were obtained by the corporation defendant from the United States Patent Office before the designing of its plant was entered upon. Mr. Schaefer, while in plaintiff's employ, assisted Mr. Dow in working out, and was co-inventor with Mr. Dow, of several of the patents. Descriptions similar to that in the first or underlying Dow patent have been published in government and technical publications.

Nothing new, novel, unique or out of the ordinary is claimed by plaintiff in respect of the construction or operation of either the purifying or absorbing tower by or in itself. The construction of the filling of the blow-out tower is claimed by plaintiff to be novel and secret. The defendant corporation does not use the same method of construction as plaintiff. Its tower is filled with sticks, each about an inch square and extending across the tower from wall to wall. These sticks are laid up like an abutment to a wood pile. First, a series is laid one way of the tower with space between about equal to the width of the sticks. Then a series with like space between is laid the other way of the tower, that is, at right angles to the first series. Further series are laid until the tower is filed, each at right angles to the series directly above and below.

No attempt is made to keep the sticks in line so that there is no straight open space from the top to the bottom of the tower. The specifications in the first Dow patent state, "Wooden surfaces may be employed," and of others that "No special form of tower is required, many forms of apparatus for bringing liquids into contact with gases being familiar to technical chemists." The specifications of plaintiff's patent issued June 25, 1907, of which Mr. Schaefer was co-inventor, state, "The towers are preferably filled with checker-work," as shown in the drawing. It is precisely this checker-work which is used by the corporation defendant. Plaintiff has never used such filling. Other patents relating to other, though analogous, arts show the identical construction used by defendant corporation, thus corroborating the statement in the latest of plaintiff's patents, issued June 27, 1916, that a blow-out tower is "of familiar construction."

A large part of the record is taken up with testimony relating to the construction of the electrolytic tank and each of several points wherein plaintiff claims that its method of construction is new, novel, unique or out of the ordinary and a trade secret. The electrolytic tank is a wooden box about 18 feet long, 6 feet wide, and 3 feet deep, and is made of planking securely fastened together so that the brine will not leak out. The size of the tank is determined by the voltage of electricity available. It is a well-known fact of electro-chemical science that a certain voltage is required to free bromine from brine. Across this box, about every 9 inches, there is a board partition. The box has an opening at each end to let the brine in at the one end and out again at the other. (The tank may be arranged so that the brine flows in at each end and out through openings at the middle.) Between the several partitions there are connections or

openings, at alternate ends, to permit the brine to pass from one compartment to another. Each of these partitions carries a number of electrodes. These electrodes are sticks of carbon the same or similar to those in an ordinary street arc lamp. Holes are bored through the partitions of the proper size to receive and hold firmly the sticks of carbon. The sticks are then inserted in the holes so as to project substantially an equal distance on each side of the partition. The position of the carbons in place is horizontal and parallel to the sides and bottom of the tank. The ends of the tank, likewise, have holes bored through and support electrodes. One end of the electrodes or carbon sticks in the ends of the tank protrudes outside of the tank. It is these protruding ends of the carbon to which the electric connections are made.

The electrolysis of liquids is familiar in the chemical industry. The use of electrolytic tanks industrially is not confined to the production of bromine. They are more extensively used in the production of chlorine and are also put to other uses. There are concerns regularly engaged in the manufacture, sale and installation of electrolytic tanks in chlorine producing plants. The chief chemist of the corporation defendant visited one of these manufacturers and investigated the construction and practicability of one of these tanks for the production of bromine before the designing of the plant of the corporation defendant was undertaken. One of the plaintiff's directors testified that the tanks in the plant of either the plaintiff or the corporation defendant could be used for the production of chlorine, saying, "It is a matter of time and quantity of current that is passing." The method of insulation of the electrolytic tanks for the production of chlorine is the method adopted and used for the insulation of the tanks in the plant of the corporation defendant. It is wholly different from that

used by plaintiff. Plaintiff's method has, however, been disclosed in one of its patents. The plaintiff impregnates the carbons used as electrodes before using them. The corporation defendant uses ordinary commercial carbons obtained in the open market and does not impregnate or treat them in any manner whatsoever. Plaintiff claims a certain method of arrangement of the carbons or electrodes as a secret. Defendant corporation does not and never did use this method. Plaintiff itself has abandoned this method and is now using the same method which defendant corporation uses. Bipolar electrodes are used by both parties. Their use and method of installation in the tank is disclosed in several of plaintiff's patents. The use of a diaphragm is shown in the drawings of one of plaintiff's earlier patents; another states it may or may not be used; and still another, that the cell is preferable without. Defendant corporation's tank is the same as plaintiff's in this particular. The relative projection of the carbons into the compartment or cell from each side was claimed as a secret. Defendant corporation procured ordinary commercial carbons and installed them. It so happened that the relative projection was substantially the same as in plaintiff's tank. When, on cross-examination of Mr. Dow, defendant corporation for the first time learned of the claim, the projection of the carbons was changed and the tank operated at least equally well. Plaintiff uses a readily obtainable, but somewhat crude, resistance duct. The material is in common and ordinary use in the salt industry. Defendant corporation constructed its tank with the same duct. When defendant corporation learned of plaintiff's claim in respect of this method of construction, it was abandoned and an entirely different method was constructed. Some 25 patents were introduced in evidence showing the use of the method so adopted. Thus it appears that not only

is the necessity of resistance ducts well understood—plaintiff makes no claim to the contrary—but, as well, the method of construction last adopted by defendant corporation is well known and commonly used. This method was found to be advantageous in operation over plaintiff's method. Some claim is made in respect of the plug in the bottom of the tank. It is not of sufficient consequence to make it necessary to state the facts in relation thereto. The tank, as constructed in the plant of each of the parties, has a cover which fits in a lute. A pipe runs from the cover to the blow-out tower and the cover has holes in it to admit air to be drawn through and out of the pipe. The purpose of the cover and other devices mentioned is to carry off the bromine, chlorine and hydrogen, which are freed and escape from the brine upon the electrolysis. The lute in defendant corporation's plant was not well constructed. The tank was found to work as well without it and it is no longer used. As testified by Professor Burgess, an eminent author on chemical engineering and electro-chemistry, these devices are perfectly obvious, involve well-known principles with which every electro-chemist is familiar, and are repeatedly discussed in the literature of the industry. The drawing of air under a cover and up a pipe can be seen in every chemical laboratory. The chlorine-producing tank—which, as before stated, is manufactured and sold in the open market—has these devices. The method of making the electrical connection to the carbon which projects out from each end of the tank was claimed to be a secret. The defendant corporation casts at one operation a lead bar which forms a cap and connection between all of the carbons in one vertical row. Plaintiff's method is entirely different. There is no similarity at all.

After testimony had been taken (which, in condensed form, covers a thousand pages of the printed

record) plaintiff asked and was granted leave to amend its bill of complaint and an amendment was filed, claiming as a secret a "complete process * * * in which was used an electrolytic cell and blow-out tower," "an organization comprising the electrolytic means for freeing the bromine from the brine, means for blowing the bromine out of the electrolyzed brine with air, means for removing impurities from bromine-laden air, and means for recovering or absorbing the bromine from such air"; and "the association, with other details of said process, and with one another, of these various developments and means above described, or any of them, in a complete process for the manufacture of bromides." The amendment was allowed, subject to the restriction that plaintiff would not be permitted to claim any combination which included that part of the process which counsel for plaintiff had theretofore admitted on the record was not involved in the claim as to secrecy. That part was the last pair of towers in plaintiff's manufacturing process, the towers being used for absorption purposes. These towers bear the same relation to plaintiff's operation as does the absorption tower in defendant corporation's operation. The claim of combination made by the amendment is the four steps of the process above described. These steps have been described both singly and all together in the specifications of plaintiff's patents. They have been referred to in government and industrial publications. Each in itself' is well known in electro-chemistry. Each in plaintiff's plant works out its own effect, just as though the other had not been brought in juxtaposition. As before stated, there are many of the details of construction, of the claimed combination which plaintiff claims as essential, though minor, which are not embodied in the plant of defendant corporation.

Questions of estoppel being raised, it becomes nec-

essary to state the circumstances under which defendant corporation was organized and its plant built. Defendant corporation was organized by the owners of the Emerson Drug Company, of Baltimore, Maryland, the makers of the well-known Bromo Seltzer. Persons interested in the Dr. Miles Medical Company, of Elkhart, Indiana, also became stockholders. The plaintiff, as before stated, has been engaged in the production of bromines since the early '90's. For many years, plaintiff has been the largest producer in the United States, producing about 80 per cent. of the entire quantity produced in the United States. For several years (ending in 1908) there was very sharp competition between the American producers and the German producers, who exported to this country. About 1908, some sort of an agreement or understanding was reached between plaintiff and other American producers and the German producers whereby this competition was stopped. The Emerson Drug Company and the Dr. Miles Medical Company—especially the former—are large users of bromine. The former has procured its supply from plaintiff for years. In 1909 a contract was made for its requirements for five years. On its expiration, in 1914, it was renewed for ten years. The price under the contract was a differential under the market price, which, by the contract, was to be determined by the average price quoted from time to time by the three largest dealers in the United States and two trade publications. It later appeared that two of the dealers were selling agents for the plaintiff, for whom the plaintiff named the prices to be charged. Prior to the outbreak of the late European war, the prices of bromine had always been less than 50 cents per pound. Soon after the outbreak of the war prices began to go up, until in the fall of 1915 and spring of 1916 bromide of potassium stood at $5.50 and bromide of sodium at $3.50 per pound.

Shortly after defendant corporation began production, prices went down—Mr. Dow testified plaintiff made them go down—to $1 and 45c respectively. They had continued about this figure up to the taking of the testimony in this suit. The Emerson Drug Company still continues to carry out its contract with plaintiff.

In the fall of 1915, when prices had risen to such figures, the persons interested in the Emerson Drug Company conceived the idea of themselves manufacturing bromides and, by putting them on the market, offset the prices which they were paying to plaintiff. About this time a letter was received from the receiver of a chemical company calling attention to its property at Midland, which was for sale. The receiver sent a copy of this letter to the Dr. Miles Medical Company. From this, those interested in that company got in touch with those interested in the Emerson Drug Company. Mr. Emerson of the Emerson Drug Company wrote to an acquaintance for some information about the property. In reply his attention was called to a chemist who had been formerly in the employ of plaintiff. The chemist, since leaving plaintiff, had done some work for the Dr. Miles Company. An option was taken on the receivership property, under which the right to sink test wells was given before its exercise was required. The results of the test wells were not favorable. Other property in that vicinity which did test favorably was acquired.

All patents relating to the production of bromine were obtained from the United States Patent Office. These included the plaintiff's patents and the Schaefer patent. The Emerson Drug Company got in touch with the chemist before mentioned and particularly inquired of him whether he could install an electrolytic process which would not conflict with plaintiff's unexpired patents. He was engaged and, together

with the chemist of the Emerson Drug Company, set about designing a plant. The idea of the process so designed was practically the same as in the original Dow patent, then expired. Through the copy obtained from the Patent Office of the patent issued to and held by Mr. Schaefer, the Emerson people got in touch with him. It was learned that he had been in the employ of the plaintiff some time before. The progress being made in the construction of the plant was not satisfactory. Mr. Schaefer was employed and the other chemist let go. Mr. Schaefer made extensive and radical changes in the design and construction. Progress seems, however, to have been rather slow and it was not until the summer of 1916 that defendant corporation got into operation. Numerous changes were required after operation was begun.

In March, 1916, plaintiff, having learned the defendant corporation's plans, sent its sales manager to Baltimore to interview the Emerson Drug Company as to the continued performance of the contract. The subject of the Emerson Drug Company going into the manufacture of bromides was also discussed. In April, plaintiff wrote, calling attention to one of its patents which plaintiff claimed would be infringed by operation under Mr. Schaefer's patent. It was further stated, "We would suggest it might be advisable for you to go very carefully into this patent situation at the present time." About this time Mr. Dow solicited a conference with those interested in defendant corporation and two conferences with them were had— one in Baltimore and the other in New York. The main subject of discussion put forward by Mr. Dow at these conferences was the infringement of plaintiff's patents. Nothing was said about trade secrets or secret processes, nor was any objection made to the employment of Mr. Schaefer by defendant corporation. Mr. Dow offered to make the prices under the

contract 75 cents and 50 cents if they would abandon the project. Mr. Dow saw the erection of defendant corporation's plant, said it was a long time in building and mentioned two occasions when he walked past to see what was being done. Nothing was heard of trade secrets until the bill of complaint in this cause was filed, nor did Mr. Dow or the plaintiff at any time prior to the filing of the bill in this cause make any claim to the Schaefer patent.

In support of the claim that plaintiff deemed its process, or some portion, a trade secret and had endeavored to maintain secrecy with respect thereto, the testimony of several persons interested in or employees—past or present—of plaintiff was produced. One testified that he had been "cautioned  *  *  * as to the secrecy of the Dow process"; another, to substantially the same effect; another, that he had been told, "We were to guard against disclosing any of the secrets of the process." Mr. Dow himself did not testify that he had ever expressly told any employee that secrets existed or that there was any rule or practice to instruct employees to that effect. The chemist who had first been employed by defendant corporation and then let go was sworn by plaintiff, but was not questioned as to the existence or his knowledge of secrets. The general superintendent under whom Mr. Schaefer had worked in plaintiff's plant testified that nothing was said by him to Mr. Schaefer as to there being any secrets, but that "those things were implied in the employment of a technical man in the chemical plant." This ex-general superintendent visited defendant corporation's plant before this suit was begun and voluntarily discussed one of the details which plaintiff in this suit claims to be one of its secrets. He also at one time contemplated equipping a plant of which he is now general manager for operation under the Schaefer patent. Two other witnesses of

plaintiff were unable to say anything of consequence as to secrets or secrecy. One witness testified that Mr. Schaefer told him "to guard against disclosing any of the secrets of the process." A man who was under Mr. Schaefer and above the witness last mentioned testified that Mr. Schaefer never gave him any instructions as to secrecy, but that Mr. Dow did and that he gave such instructions to the witness last mentioned. Mr. Schaefer testified positively that he never at any time while in plaintiff's employ or previous to the bringing of this suit was instructed or informed or heard or knew that there was any claim of the existence of trade secrets. He is corroborated by three other ex-employees of plaintiff. Evidence was also given as to the taking of precautions or maintaining of conditions ordinarily obtaining in the conduct of every well-managed industrial plant, such as a picket fence around the plant and "No Admittance" signs. These do not require particular statement. Mr. Dow referred to the use of fictitious descriptive names for certain portions of the plant. There was other testimony that they were nicknames given by some of the men because of some attribute fancied to appertain to the word used.

The patent issued to and held by defendant Schaefer relates to the absorption of bromine from the air after the air has passed through the purifying tower. The patent was applied for over a year after Mr. Schaefer left plaintiff's employ. After it was issued, Mr. Schaefer offered to sell it to plaintiff, but plaintiff declined to purchase and made no claim to it. This was a considerable time before the project of defendant corporation was conceived. Mr. Schaefer testified that the idea covered by the patent was conceived after he left plaintiff's employ and was worked out and its possibility demonstrated by himself individually. The testimony offered by plaintiff is not that Mr. Schaefer

made the invention while in plaintiff's employ. There is not a scintilla of evidence to that effect. Plaintiff's testimony is that of Mr. Dow—that this process "was in operation when Mr. Schaefer came there, before that and since that," and of another witness—that it was first brought into operation at a time between Mr. Schaefer's first employment and his last employment, Mr. Schaefer having been away about two years. Mr. Dow was "unable to say" whether the idea was intentionally availed of or whether the process came into operation through the laziness of some of the employees. Mr. Schaefer testified that he never saw the process in operation in plaintiff's plant at any time while he was there. Plaintiff does not claim that the process was ever in operation in the fourth or absorbing step in its process. This is the step in which the patent is designed to be used and is used in defendant corporation's plant. Plaintiff claims the process was in operation in the third or purifying step in its plant. The claim that it was so in operation is based upon the further claim that iron bromide was at some time begun—whether intentionally or through laziness—to be dumped (it was carried in pails) into the bottom, instead of the top, of the purifying tower. This, Mr. Schaefer testified, he never saw done. To show that the process is in operation in plaintiff's purifying tower, analysis of some of the contents of the pit at the base of the tower was made by one of the plaintiff's witnesses in open court. The analysis showed ferrous bromide to be present. The analysis was, however, qualitative and not quantitative and hence, as defendants point out, did not tend to show whether there was but a trace present or a substantial proportion. To attempt to state in detail the process covered by the Schaefer patent would require too much space. The patent is, of course, a matter of public record. It is sufficient to state that

the operation is to pump ferrous bromide into the top of the *absorbing* tower, which, as it drips down through the bromine-laden air, being drawn by suction up through the tower, takes up or absorbs another part of bromine and becomes ferric bromide in the pit at the base of the tower. There are two, and only two, chemical combinations of iron and bromine, namely, ferrous bromide, composed of one part iron and two parts bromine, and ferric bromide, one part of iron and three parts of bromine. It is this additional part of bromine which is taken up or absorbed in the operation. The operation in plaintiff's *purifying* tower is to put ferric bromide in at the top of that tower, which, as it drips down through the air carrying chlorine and bromine — being drawn by suction up through the tower—gives off the bromine and takes up or absorbs the chlorine and becomes ferric chloride in the pit at the base of the tower. The bromine is so given off and chlorine taken up or absorbed in plaintiff's purifying tower, because iron has a greater affinity for chlorine than for bromine, and the chlorine thus displaces the bromine in the liquid. The presence of ferrous bromide at the top of plaintiff's purifying tower has no intended part in the operation sought to be effected in that tower. On the contrary, it tends to retard or interfere with that operation. It is found in the pit at the base of plaintiff's purifying tower only because, and to the extent that, the operation there sought to be effected is not perfectly accomplished. The more nearly perfect the operation of the purifying tower, the less ferrous bromide can be present in the pit at the base of the tower. On the other hand, the presence in defendant's absorption tower of chlorine in the air or in the solution pumped into the top of that tower would, to the extent so present, prevent the chemical operation there sought to

be effected and render the tower wholly ineffectual for the purpose intended.

At this point it is worthy of note that plaintiff did not invoke the aid of a Federal court for the purpose of enjoining defendant from using the Schaefer process under the claim that such use was an infringement of unexpired patents owned by it (which had theretofore been its claim), but by its bill it set out that many important features of its process or processes of production were unpatented and secret in their nature; that Schaefer, through his long employment by the plaintiff, had become possessed of such secret features and that the corporate defendant and defendant Schaefer had wrongfully and fraudulently appropriated such secret features and incorporated them in defendant's plant. It prayed for an order restraining the corporate defendant from operating under the Schaefer patent; for a further order restraining Schaefer and the corporate defendant from assigning or selling said patent; for a decree ordering the assignment of said patent No. 1,085,944 to plaintiff, and for an accounting. To this bill of complaint defendants severally filed answers denying all material averments.

After a full hearing upon the merits a decree was entered in the circuit court by the terms of which it was determined that the corporate defendant had wrongfully appropriated trade secrets belonging to the plaintiff enumerated in the decree to the number of 13. The corporate defendant was perpetually restrained from employing said Schaefer in the manufacture of bromides involving the electrolytic and blowing-out process. Both defendants were perpetually enjoined from using any of the so-called enumerated trade secrets. Both defendants, their agents, etc., were perpetually enjoined from disclosing to any person any knowledge or information of the so-called trade se-

crets.  Both defendants were ordered to deliver to plaintiff all drawings, sketches, notes, etc., disclosing the said trade secrets or any part or parts thereof. The plant of the corporate defendant, insofar as it contains or discloses any of the so-called trade secrets, was decreed to be dismantled or destroyed within 60 days.  An accounting was decreed.  Defendant Schaefer was ordered within 30 days by proper and legal instruments of conveyance to turn over to the plaintiff his letters patent, No. 1,085,944.  The corporate defenuant was decreed to transfer to the plaintiff such interests as it might have in said patent.  From the decree so entered, both defendants have appealed.

The claims of the plaintiff arising upon this appeal, as already indicated, are:

(1) The details above mentioned of the construction of the electrolytic tank and blow-out tower are trade secrets.

(2) The complete process used by plaintiff for the production of bromine, consisting of a claimed combination of the electrolytic tank, blow-out tower, purifying tower and absorbing tower, is a trade secret.

(3) These claimed trade secrets are property of the plaintiff for which the plaintiff is entitled to protection by this court.

(4) The claimed trade secrets, or some of them, have been appropriated and are in use by defendant corporation, and this use should be enjoined.

(5) The appropriation by defendant corporation of the claimed trade secrets was accomplished by the employment of Mr. Schaefer and another chemist who, at some time in the past, had been employees of plaintiff and who communicated the same to, or made use of the same for the benefit of, defendant corporation.

(6) Mr. Schaefer and the other chemist were, by reason of their contract with plaintiff (the material portion of which is above set out), the nature of their relation to plaintiff, and otherwise, obligated to secrecy in respect of the matters complained of, and plaintiff is therefore entitled to an injunction against the use of such ideas so obtained through wrongful disclosure.

(7) The patent taken out and held by Mr. Schaefer is, under his contract with plaintiff (the material portion of which is above set out), the property of the plaintiff and plaintiff is entitled to a decree requiring its assignment and delivery to plaintiff, and enjoining the use by defendant corporation of the process covered thereby.

(8) Damages are also claimed in respect of the several matters claimed to be wrongs.

The defendants claim:

(1) The alleged trade secrets, both as to details of construction and claimed combination, are not property rights because heretofore disclosed to the world at large in the claims of expired patents, the descriptions or specifications in existing patents, patents in analogous arts, such as chlorine, and in trade and governmental publications, and because simple and obvious to the beginner in the study of chemistry and some of them to the mere mechanic or ordinary person.

(2) Estoppel of the plaintiff to now claim any trade secrets against defendants because plaintiff opened and carried on correspondence and solicited and took part in conferences with officers of defendant corporation while defendant corporation was getting its project under way, in and by which plaintiff gave warning of infringement of patents, but made no mention of trade secrets, and defendant corporation went ahead and built its plant, believing plaintiff had stated all its claims. In this connection, defendants urge that plaintiff did not at that time itself conceive that it had any trade secrets.

(3) In the application for patents covering different details of the process or devices used therein which plaintiff has caused to be taken out from time to time, what plaintiff now claims, as trade secrets, to be essentials of the operation were not disclosed, and if they were as essential as plaintiff claims, then plaintiff, in obtaining such patents, committed a fraud, because the patent law requires the applicant to disclose the manner of constructing and using the invention in such full, clear and exact terms as to enable any person skilled in the art to which it appertains, or with which it is most nearly connected, to make,

construct and use the same and to explain the principle thereof and the best mode contemplated of applying it, and therefore plaintiff cannot now have protection, as trade secrets, for the features which have not heretofore been disclosed.

(4) By virtue of the statute (3 Comp. Laws 1915, §§ 15033 and 15037), if not at common law as well, an employer can acquire no property in or right over the mind, any more than the body, of the employee after the employment has terminated; and every employee, after the termination of his employment, has the absolute right to use, either for himself directly or for the benefit of any subsequent employer, any experience, information or knowledge, other than that covered by existing patents, acquired in his former employment.

(5) The patent issued to and held by Mr. Schaefer was invented by him after he left the employ of plaintiff, and for that reason was not within his contract to assign patents to plaintiff.

(6) If the idea was in use, as claimed by plaintiff at, before and during the time of Mr. Schaefer's employment in its plant, then the patent is void and plaintiff cannot require a void patent to be assigned to it or restrain others from making use of it, but the validity of the patent cannot be questioned in this suit, as that question is within the sole and exclusive jurisdiction of the United States court.

(7) Estoppel of the plaintiff to make any claim to Mr. Schaefer's patent as against defendant corporation, because plaintiff was early informed that defendant corporation intended to make use of the patent and stood by and watched defendant corporation build and equip its plant for operation under the patent without making any claim thereto.

Brooke, J. (*after stating the facts*). It is first asserted broadly on behalf of defendants and appellants that no trade secret in the legal sense ever existed in plaintiff's plant. On the other hand, it is claimed by counsel for plaintiff that the various apparatus and processes used by the plaintiff in securing its product, in the particulars pointed out in the decree (the use of which, by said decree, was denied defendant) were

secret. The following precautions, alleged to have been taken by plaintiff to insure secrecy in and about its plant, are relied upon by plaintiff:

"By surrounding by fences, warnings and watchmen.
"By keeping premises locked.
"By enclosing tanks and towers.
"By locating tanks on upper floors.
"By instructions to employees.
"By exclusion of visitors.
"By destruction of discarded parts of apparatus.
"By use of fictitious descriptive names.
"By check on plans and drawings."

A great mass of evidence was introduced on behalf of both parties touching this question. Much of the evidence offered on behalf of the plaintiff was contradicted by evidence produced by defendants. Many of the facts relied upon by plaintiff to establish secrecy were conceded by defendants to exist as claimed but it is asserted that such precautions as actually were taken in and about plaintiff's plant were taken not for the purpose of preserving inviolate such secrets, but were simply "such ordinary factory precautions as are taken for the purpose of protecting the property of the owner from theft or vandalism, to prevent interference with the workmen, to guard against accidents to visitors, to prevent employees from leaving the building during working hours, etc."

Counsel for appellee define the word "secret" as follows:

"A secret is something known only to one, or a few, and kept from others; anything hidden from general knowledge or observation; something not to be told." Nims, Unfair Competition, § 141.

And it is urged that in considering the case before the court we should carefully have in mind the fact that this is not a patent case.

Arguing by analogy from patent law, it is asserted

by counsel for appellants that a "trade secret" must possess (*a*) originality or novelty, (*b*) utility, and (*c*) be in fact a secret, that is, known only to the party claiming it and employees working with it. Referring definitely to plaintiff's claims of secrecy, it is said:

"1. One at least is wholly false.

" 'The arrangement of the carbons or electrodes in diagonal rows. It is not used by defendant. It has been abandoned by plaintiff.'

"2. Several are not used by defendants.

" 'The arrangement of carbons in diagonal rows, petticoat insulation, impregnation of carbons with paraffine or other substance, lath combs in tower, lead connections to electrodes having any similarity to plaintiff's.'

"3. Some of them exist in defendant's plant though they just happened to be there and were not intentionally designed.

" 'Overlapping carbons, carbons which project some distance outside of the tank into which the electrical connection is made.'

"4. Several have been disclosed in Dow patents.

" 'Insulation of the tank, impregnation of the carbons, bipolar electrodes, lead connections to the carbons, wood filling in the tower.'

"5. Some of them, though constructed in defendant's plant, have been found to be of no substantial practical utility.

" 'The lute to the cover of the tank, overlapping carbons, pump log connections between compartments or cells of the tank.'

"6. Each and every of them, without exception, are so simple, open and obvious to one skilled in electrochemistry (some of them to an ordinary mechanic) that no novelty or secrecy can possibly be claimed in respect to them.

" 'The tank being made of wood, the plug with a handle long enough to project above the brine, bipolar electrodes, the cover to the tank, the lute to the cover, the ventilation of the cover, the pump log connection between the cells, the lead connection on the ends of the carbons, the wood filling in the tower.'

"7. If any of them could under any circumstances be recognized as a trade secret, they cannot at the instance of plaintiff, because if they possess any utility whatsoever, good faith and the observance of duties imposed by law required their disclosure in connection with the application for one or more of the several Dow patents and the withholding of them was a fraud upon the public in the continued perpetuation of which plaintiff can have no assistance from the court."

Touching the claims of plaintiff and appellee relative to the precautions taken in its factory to preserve secrecy as to its apparatus and process, a careful examination of the record has convinced us that, considering the dangerous character of the work in which plaintiff was engaged, the precautions taken were no greater nor different from those which would or should have been indulged in by any prudent manufacturer engaged in a like enterprise.

Adverting to the claim of the plaintiff that the individual defendant, as well as all other employees, were warned that the process and machinery should be carefully guarded and kept secret from the outside world, we find the evidence in very marked conflict. We believe the evidence upon this point to preponderate in favor of defendants and conclude, therefore, that plaintiff's claim in this regard is not sustained and further, as a matter of fact, that no "trade secrets" in a legal sense ever existed in plaintiff's plant. Many facts standing undisputed upon the record impel us to this conclusion, among which the following may be mentioned:

*First.* An inventor, desiring to secure to himself the fruits of his invention, has two courses open to him,—*first,* to patent the same, thus securing an absolute monopoly for a limited time; or *second,* to keep his invention a secret, by which means he gets an imperfect monopoly for an indefinite period. It is quite

obvious that Mr. Dow chose the former alternative. He patented his original process and apparatus and from time to time thereafter for 20 years secured many other patents, which he doubtless believed would tend to make his monopoly in his particular field of activity more complete. Some four or five of these patents were based upon inventions of the individual defendant, either alone, or in conjunction with others. Mr. Dow doubtless considered—and we believe rightly so—that a perfect monopoly for the limited period allowed by the Federal statute would result more advantageously to himself than would a course based upon the theory of secrecy.

*Second.* In 1908, when Mr. Dow exacted from his employees a written contract with reference to inventions made by them while in his employ, we find that contract absolutely silent touching any obligation on the part of the employees to maintain secrecy touching the machinery and processes employed by the Dow Chemical Company. At that time, the matter of the protection of his corporation and its rights was under consideration by Mr. Dow and it surely is not unjust to him to say that the subject treated in the contract was fully covered by him.

*Third.* That Mr. Dow himself fully understood that the individual defendant had entered into no agreement to maintain secrecy as to the ideas he had acquired during his employment is conclusively established by a letter written by Mr. Dow to defendant Schaefer on June 10, 1911, which follows:

"MR. A. E. SCHAEFER,
    "Saginaw, Mich.
*"My dear Mr. Schaefer:*
    "We are in receipt of your letter of June 8th and note your proposition. We also realize that there are difficulties with the process which might arise and can also see that there would be a very good chance of some misunderstanding arising that might cause

a deal of the kind you propose to be unsatisfactory either to you or to the Dow Company.

"It would seem to me to be more satisfactory from every standpoint to pay you a regular salary which would be a combination of salary and retainer fee, whereby we would be at liberty to call upon you at any time for any ideas that you might possess and whereby you would impart your ideas to us solely. If a deal of this kind meets with your approval, we would enter into a five year agreement with you to pay you $10.00 per month for such service as you could render us without materially interfering with your regular occupation.

"The chemist whom the Merck people have just employed to run their little plant here had to sign an agreement that in case he left their employ, he would not utilize the ideas that he had acquired during his employment with that company or impart the idea to others, in consideration of a certain sum of money, this to hold as long as the Merck Company continued to pay him for such secrecy. If you would care to incorporate this feature in the arrangement made with you, it would be an additional reason why the Dow Company should put you on its pay-roll and keep you there.

"Yours very truly,
"THE DOW CHEMICAL COMPANY,
(Signed) "By HERBERT H. DOW,
"General Manager."

*Fourth.* When confronted with the possibility of competition through the erection of the plant by the corporation defendant, Mr. Dow sought to dissuade the promoters of the enterprise from proceeding with the project. He had more than one interview with individuals representing the defendant and, according to his own testimony, his claim at that time was not that the corporation defendant was fraudulently appropriating a secret process, wrongfully disclosed to it by the individual defendant, but he based his claim for relief against them at that time upon the alleged fact that the so-called Schaefer patent, under which

they were about to operate, was an infringement of
one of his patents (No. 733,467). The idea of secrecy
appears not to have originated in Mr. Dow's mind until
the fall of 1916, at which time defendant's plant was
in operation. This suit was filed in November, 1916.

We are impressed that the claim of secrecy on the
part of the plaintiff is an afterthought, indulged in,
possibly, by reason of the fact that Mr. Dow felt re-
lief through injunctive process from the Federal courts
for infringement was doubtful. The situation pre-
sented by the case at bar is wholly at variance with
that considered by us in the "Sticky Fly Paper" case
(*O. & W. Thum Co.* v. *Tloczynski*, 114 Mich. 149
[38 L. R. A. 200]), and in the supporting cases there
cited. In that case no effort had been made by the
plaintiff to protect the invention by patent, but re-
liance for protection was placed solely upon secrecy.
And, moreover, the court found no difficulty in de-
termining that an express contract existed between
plaintiff and defendant, by the terms of which defend-
ant was bound not to disclose the secrets of the oper-
ation learned by him in the course of his employment.
Our conclusions upon this branch of the case are fatal
to the claims of the plaintiff. But several other rea-
sons exist, which, in our opinion, render it impossible
for it to secure the relief prayed.

It is asserted by counsel for appellants that many
of the alleged secrets are disclosed, either actually or
by necessary inference, in plaintiff's patents Nos. 987,-
717, 1,053,266 and 1,070,454. Adverting to this claim,
plaintiff's counsel say:

"These patents do indeed disclose a bipolar cell, the
last named illustrating electrodes constructed out of
a plurality of carbon rods. The type of cell disclosed,
however, in all three of these patents, is of the dia-
phragm type, is not adapted for the commercial pro-
duction of bromine and, in fact, any attempt thus to
employ the same would be disastrous."

And further, in reference to patent No. 1,188,138 (an invention of Mr. Schaefer) it is said:

"Mr. Schaefer, in testifying regarding this patent, has presumed to interpret both the drawing and the language of the specification, in an altogether arbitrary and unwarranted fashion.    Conceding that the invention was his, and that preliminary notes for the application were prepared by him, he has admitted that the papers and drawings were revised by Mr. Griswold, and the most superficial comparison of the showing of the patent with that of other related patents of the Dow Company would indicate that in accordance with the policy of the company as explained by Dr. Smith (Rec. 1378), no details of apparatus are shown, but only a diagramatic outline of the plant sufficient under the patent law to sustain claims to the process upon which protection was desired.    He says, 'I think it has been a distinct policy of the company to not apply for patents on details of apparatus as used in the bromide plant.' "

In all of the Dow patents except one, the applicant or patentee (usually Mr. Dow himself) states:

"*   *   *   The principle of the invention being herein explained and the best mode in which I have contemplated applying the principle"   *   *   *

The patent law (U. S. Revised Statutes, § 4888) requires the inventor to set forth—

"*   *   *   the manner and process of making, constructing,   *   *   *   and using it in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains or with which it is most nearly connected, to make, construct   *   *   *   and use the same; and in the case of a machine, he shall explain the principle thereof and the best mode in which he has contemplated applying that principle."   *   *   *

It would appear from the assertion of counsel for plaintiff and from the testimony of Dr. Smith, one of its expert witnesses, that the plaintiff, in securing its

patents, purposely refrained from disclosing "the best mode in which he has contemplated applying that principle," and endeavored to maintain secrecy as to such "mode."

The obligation resting on the patentee is set out in Robinson on Patents (Vol. 1, § 42, and Vol. 2, ¶ 494), as follows:

"Through the whole body of the law runs the same principle, that the real consideration given to the public for the patent privilege is not the skill of the inventor in inventing, but *his honesty and thoroughness in making his discovery known.* The inventor, therefore, who does not fully disclose his invention, at the time and in the manner required by law, does not fulfill his contract with the public and is not entitled to the privilege which he receives."

"A wilful false suggestion or concealment, in any point material to the invention or to the mode of making or using it, is also fatal to the interests of the inventor. He is obliged to keep faith with the public; and as he seeks to obtain the widest protection which it is in their power to bestow, he is, in his turn, bound to confer on them *his entire secret in its most available and beneficial form. If for the purpose of misleading them and securing some advantage to himself* he states in his description *less than the whole truth,* or asserts that things are necessary to produce the desired effect when he knows that they are not so, the fact that some degree of benefit may be derived from what he has described will not prevent the forfeiture of all right to any patent for the invention."

In the case of *Dornan* v. *Keefer,* 49 Fed. 462, it is said:

"In applying for the patent it was his duty to disclose the most available method known to him of carrying the discovery into effect * * * This information, which may be used by others after his patent has expired, is an important part of the compensation which the public obtains for the temporary monopoly granted him. If he could withhold it, disclosing an inferior method simply, which he does not employ,

the discovery would never become available public property, as the patent laws contemplate it shall. He would have a monopoly after his patent had expired, which would continue so long as he could conceal this material part of his discovery. I do not say that such disclosure was essential to the validity of his patent (that question is not before me), but that the information withheld does not constitute such a secret as the section, or equity, protects."

See, also, upon this point: Curtis on Patents, § 250; 30 Cyc. p. 885; *Whitney* v. *Mowry*, 29 Fed. Cas. No. 17,592 (on appeal, 81 U. S. 620); *Electric Boot & Shoe Finishing Co.* v. *Little*, 75 Fed. 276.

If the facts as to secrecy are as now claimed by Mr. Dow and his supporting witnesses, his conduct (he being a representative of and in control of the plaintiff) has been such—under the foregoing authorities—as to deprive the plaintiff of equitable relief.

Our statute (Act No. 329, Public Acts 1905) entitled "An act relative to agreements, contracts and combinations in restraint of trade or commerce" provides:

"All agreements and contracts by which any person, copartnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited, are hereby declared to be against public policy and illegal and void." 3 Comp. Laws 1915, § 15033.

"This act shall apply to agreements, contracts and combinations in restraint of trade or commerce heretofore entered into or made, and which are sought to be enforced or maintained after this act takes effect; and all contracts and agreements in violation of this act heretofore made, expressly or impliedly, continuing in force after this act takes effect, are hereby declared to be against public policy and illegal and void." 3 Comp. Laws 1915, § 15037.

That statute has been under consideration by this

court in *Grand Union Tea Co.* v. *Lewitsky,* 153 Mich. 244, and *Grand Union Tea Co.* v. *Dodds,* 164 Mich. 50 (31 L. R. A. [N. S.] 260). In the latter case we held the statute prevented the enforcement of a contract which restrains the employee from entering into another business where he would make use of the knowledge obtained in the employer's business. This statute was passed since our decision in the *Sticky Fly Paper Case.* It is, perhaps, unnecessary to consider its bearing upon the questions presented in the case at bar, although it is apparent from an examination of the bill of complaint that relief is sought against the individual defendant because he "well understood that it would be a breach of trust and fraud upon his employer if he then or ever divulged to any person whatsoever any of the secrets or secret devices, apparatus, methods or processes or the secret construction of said apparatus." Of course, it would be immaterial whether Schaefer's obligation arises out of an "understanding," as stated in the bill, or out of an "agreement" or "contract" prohibited by the statute. In either event, it would appear (though such conclusion is not necessary to determination) that defendant Schaefer could not by contract or understanding lawfully bind himself to forever refrain from engaging in the manufacture of bromides by the electrolytic and blowing-out process, either by himself or in conjunction with others.

We are of the opinion that the Schaefer patent, under which the corporate defendant is now operating, was, as claimed by him, based upon investigation and invention subsequent to the termination of his employment by plaintiff. It is, therefore, not subject to the terms of the contract existing between him and the plaintiff during the latter years of his employment. If said patent is an infringement on any patent owned or controlled by plaintiff (as originally

claimed by Mr. Dow), plaintiff has its remedy in the Federal courts for such infringement.

Through the beneficent operation of the patent laws, plaintiff has, for a great many years, enjoyed a practical monopoly in the production of bromides. That monopoly clothed it with power to exact an exorbitant price for its product, which power at times, the record discloses, it did not hesitate to exercise. As soon as defendant commenced quantity production of bromides, the price of the product in the open market dropped to a figure only about one-fifth that exacted by the plaintiff prior thereto.

Upon broad equitable principles and in consideration of public policy, plaintiff should be denied relief unless its claim thereto is clearly established. After a careful consideration of this very voluminous record, we have no hesitation in reaching the conclusion that plaintiff has failed to so establish its right to relief.

The bill is dismissed, with costs in both courts.

MOORE, C. J., and STEERE, FELLOWS, STONE, and BIRD, JJ., concurred.

The late Justice OSTRANDER and Justice KUHN took no part in this decision.